# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 4, 2008 Session

## STATE OF TENNESSEE v. JIM GERHARDT

**Appeal from the Circuit Court for Madison County**
**No. 05-600    Roy B. Morgan, Jr., Judge**

---

**No. W2006-02589-CCA-R3-CD  - Filed January 23, 2009**

---

In October 2005, a Madison County grand jury indicted the defendant, Jim Gerhardt, on one count of child abuse and neglect, a Class A misdemeanor. Following a July 2006 jury trial, the defendant was acquitted of the offense as charged in the indictment but convicted of attempted child abuse and neglect, a Class B misdemeanor. Following a sentencing hearing, the defendant received a six-month sentence, with the defendant to serve sixty days in the county jail and the balance of the sentence on probation. As part of the defendant's probation, the trial court instituted a 8:00 p.m. to 7:30 a.m. curfew, ordered the defendant to have no contact with the victim, and required that the defendant receive counseling. On appeal, the defendant argues that: (1) the evidence produced at trial was insufficient to support his conviction; (2) the trial court erred by failing to require the state to elect offenses; (3) the trial court erred by failing to answer a question posed by the jury during its deliberations; (4) the trial court erred by allowing the prosecuting attorney to ask the defendant and his wife whether a particular witness was lying; (5) the trial court erred by allowing the prosecuting attorney to make improper statements during the state's closing argument; (6) the trial court improperly denied the defendant the transcript of the sentencing hearing; (7) the trial court imposed an excessive sentence; (8) the defendant received the ineffective assistance of counsel at trial; and (9) the cumulative effect of these and other errors prejudiced him. After reviewing the record, we conclude that the defendant's issues are without merit and affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Jim Gerhardt, Wildersville, Tennessee, (on appeal) pro se; Daniel J. Taylor, Jackson, Tennessee (at trial),  for the appellant.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; James G. Woodall, District Attorney General; and Rolf S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Initially, we note that the statement of facts of this case has been the subject of much dispute on the part of both parties. Generally, a defendant tried for a misdemeanor offense is not automatically provided with a court reporter at state expense. See Tenn. Code Ann. § 40-14-307(a) (2006) (court reporter shall attend "every stage of each criminal case before the court"); id. § 40-14-301(3) ("criminal case" defined in pertinent part as "the trial of any criminal offense which is punishable by confinement in the state penitentiary"). "In other words, a court reporter [is] not provided at state expense for a misdemeanor unless a defendant [is] unable to afford one based upon indigency." State v. Nail, 963 S.W.2d 761, 764 (Tenn. Crim. App. 1997). In this case, the defendant was not declared indigent until December 2006, after the jury trial had concluded.[1] Furthermore, in his "Motion to Amend Order to Prepare Transcripts," one of the numerous post-trial motions the defendant filed in this case, the defendant noted that "[d]uring a break in one of the [pre-trial] hearings in this matter," which the defendant believed took place in May 2006, trial counsel instructed the court reporter, who had apparently been present at all proceedings to that point,[2] to stop recording the proceedings.[3] In that same motion, the defendant stated that he was declared indigent at a December 6, 2006 hearing and that the court reporter was present to record all hearings after that point. Therefore, although not explicitly stated anywhere in the record, it appears that no court reporter was present to record the trial proceedings, the sentencing hearing, or the hearing on the defendant's motion for new trial.

When no verbatim transcript is available, the appellant may prepare "a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(c). The state may file objections to the statement of evidence; if such objections are filed, the trial court shall decide what may be properly included within the statement of evidence on appeal. See Tenn. R. App. P. 24(c) & (e). In this case, the defendant recorded portions of the trial testimony and, after the trial court declared him indigent, he petitioned the trial court to order the court reporter to prepare a transcript based on these recordings. The court ordered that the defendant submit these recordings to the state for its review; after reviewing the recordings, the state filed an objection, noting that the testimony of

---

[1] The defendant claims that he would have qualified as indigent as early as April 2005 and that he asked trial counsel move to have him declared indigent at that time, but trial counsel made no such motion. This alleged failure to seek indigency status is one of the numerous bases for the defendant's ineffective assistance of counsel claim.

[2] No transcripts from any pre-trial hearings appear in the record. The defendant filed a motion to have these transcripts prepared, but the trial court denied this motion.

[3] The defendant claims that he "asked [trial counsel] to request that a court reporter be provided for him at trial" and that he and trial counsel "argued about this fact minutes before the commencement of Defendant's trial." However, the defendant ultimately "relied on the statements made to him by [trial counsel]" and did not pursue the court reporter issue at the time of trial.

several witnesses was missing,[4] the "quality of the audiotape varie[d] greatly," and the state "ha[d] no assurance that the tape is a verbatim recital of the evidence and the proceeding." A protracted series of motions, counter-motions, and hearings followed. In the end, the trial court refused to order the court reporter to prepare a transcript from the defendant's tape, but it did allow the defendant to file, pursuant to Rule 24, a statement of the evidence, based largely upon his own transcription of the audio recordings. The trial court also ordered that the state's objection to the defendant's statement of evidence, which incorporated by reference an "Amended Bill of Particulars" it had filed in June 2006, be incorporated into the statement of evidence.

## Trial Testimony

The first witness to testify at trial was the victim, T.R.,[5] who was twelve years old at the time of the events which form the basis of these proceedings. The victim's testimony does not appear in the statement of evidence;[6] according to the state, at trial T.R. said that the defendant abused him on an almost daily basis between November 1, 2004, and the date he was removed from the custody of his mother[7] and the defendant, who was T.R.'s stepfather. According to the victim, these events took place at the Jackson residence shared by the defendant, his wife (the children's mother), the victim, and his sister. In its summary of T.R.'s testimony, the state noted that T.R. "suffered from fear and humiliation, which was caused by the . . . actions of [the defendant]."

According to the state, T.R. testified that the defendant excessively disciplined him, including what the state called "extensive write offs."[8] The defendant also restricted the victim's reading privileges, prevented him from taking part in physical activities such as karate, in which the victim had participated before these events, and forbade him from watching television for three months. The victim also testified that the defendant submitted him to "[a]cts of interrogation," which included writing "confession statements" detailing his supposed transgressions. At trial, approximately thirteen pages of these statements were introduced into evidence.

T.R. testified that he was routinely locked in his room, with the door being locked from the

---

[4]In a later filing, the defendant claimed that the absence of these witnesses from the recording resulted from trial counsel's "mov[ing] and tamper[ing] with Defendant's digital recorder during the jury trial in this matter."

[5]As the victim and his sister, who also testified at trial, are juveniles, we will reference them by their initials.

[6]The state's amended bill of particulars summarizes the victim's testimony on direct examination; the statement of evidence summarizes the victim's testimony on cross-examination, and it also summarizes the victim's direct examination testimony in lesser detail.

[7]Lorria Gerhardt, the children's mother, was indicted as a co-defendant in this case. Prior to trial, her case was severed from the defendant's. She ultimately entered a best interest plea to attempted child abuse and neglect and was sentenced to six months probation. She was married to the defendant at the time of these events, but according to the defendant the couple are no longer married.

[8]Although the state does not define the term, an exhibit introduced at trial indicates that T.R. was, on one occasion, required to write "I will not lie to Mother or Jim ever again" 1000 times.

outside. On at least one occasion, T.R. was left at home alone, locked in his room. The victim said that in addition to locking him in his room, the defendant required him to either sit or lie down on the bed or stand in one particular spot while in his bedroom. The victim testified that he was not allowed to go the bathroom except when permitted to do so by the defendant and his mother, despite any physical problems the victim had. According to medical records, the victim suffered from various "gastrointestinal complications including lactose intolerance, constipation, and encopresis."

According to the state, T.R. testified that was "only fed a very limited amount of bread and bologna and occasionally ham and cheese. His fluid intake was primarily limited to water." The victim said that he was ordered "not to speak with or have contact with his younger sister," his mother, or his friends, and that he was not allowed to speak to anyone regarding his treatment at the defendant's home.

According to the state, the victim testified that the defendant "committed acts of physical abuse on an almost daily basis including striking, kneeing, hitting and kicking [him] in various parts of his body, head and face." The victim also testified that the defendant hit him on the buttocks with a belt and a two-by-four wooden board on several occasions. The victim also testified that the defendant "used physical force to subdue [him]," which included applying force on "pressure points throughout [his] body." Furthermore, the victim said that the defendant "threatened and intimidated" him through threats of physical violence and depriving him of food and water.

Before the children's Christmas 2004 break began, T.R. and his sister spent a significant amount of time with their grandparents. During the week, either the defendant or his wife transported the children from Jackson to their respective schools in Chester County. After school, the children would take the bus to the home of Charles and Clessie Stovall, their maternal grandparents. The defendant or his wife would then return the children to the family home in Jackson, where they would spend the night. According to T.R., the defendant instructed the Stovalls to impose the same rules and system of punishments upon T.R. as existed at the defendant's home. If the grandparents refused to follow these instructions, T.R. would not be allowed to see his grandparents.

According to the defendant's statement of evidence, on direct examination T.R. said that the defendant beat him on an almost daily basis between November 2004 and January 2005. T.R. said that the defendant used a two-by-four board or his fist, and that as a result of the beatings, he suffered bruises to his face and body. T.R. also testified that his mother and the defendant gave him nothing to eat except bread, bologna, Kool-Aid, and water. On cross-examination T.R. admitted that during the period when either his mother or the defendant transported him and his sister from the defendant's house to their respective Chester County schools, he ate breakfast each morning. T.R. said that he either ate breakfast at the defendant's house or at a McDonald's on the way to school. T.R. also said that he ate lunch daily at school and also ate supper at his grandparents' house around 4:30 p.m each day. T.R. also testified that after arriving at the defendant's house each evening, he was provided with another meal at around 7:00 p.m. T.R. also said that during Christmas break, he ate meals and snacks provided by Mrs. Hibbits, his day care provider. He also testified that his mother and the defendant took him and his sister to dinner on several occasions during the Christmas break.

Dr. William Woods, T.R.'s pediatrician, testified regarding the victim's medical history and symptoms. The defendant did not transcribe or summarize the physician's testimony, while the state summarized the physician's testimony as follows:

The victim suffered from severe constipation and encopresis. Encopresis includes an involuntary loss of control of the bowels caused by severe constipation. In eight out of ten times constipation in cases such as [T.R.'s] is caused by holding the bowels. If a child with encopresis was forced to hold his bowels that would adversely affect the child's health and welfare.

The testimony of several other witnesses was not summarized or transcribed by the defendant and summarized only briefly by the state. Mr. and Mrs. Stovall, the victim's maternal grandparents, "testified regarding noticeable changes in the child's health and behavior during the relevant time periods." Officer Larry Scandrett with the Jackson Police Department testified that when he inspected the defendant's home, he observed that "the door to the victim's bedroom contained a lock on the outside of the door and an alarm." Maryland Davis, one of T.R.'s teachers, and Sabrina Anderson and Johnny Dodd, two persons whom T.R. met through the Boys and Girls Club, all testified that they observed bruises on the victim. Furthermore, Lorria Gerhardt testified on the defendant's behalf, but neither party's statement of the evidence summarized her testimony.

The defendant transcribed the trial testimony of four witnesses: himself, Dr. Christie Brooks, Officer Cathy Ferguson, and S.R., the victim's sister. Dr. Brooks, a psychologist at Le Bonheur Children's Medical Center in Memphis, conducted a psychological evaluation of T.R. in June 2005. Dr. Brooks testified that as part of her work with Le Bonheur's Center for Children and Parents, she interviews children referred to the Center by the Department of Children's Services (DCS) for suspected abuse and neglect and that T.R. was one of the children referred to her. Dr. Brooks said that after evaluating T.R., she made a "general diagnosis of physical abuse and neglect of the child." She said she made the evaluation based on her interview with the victim and his grandparents, as well as "through discussions with other team members involved in the case."

Dr. Brooks testified that in her report, which was introduced into evidence, she noted that the victim expressed concerns about his mother's relationship with the defendant. According to Dr. Brooks, T.R. "said that, in his belief . . . he got along with his [m]om pretty well before getting his stepfather but after his mother and stepfather got married, he felt things had gotten worse. . . . [The defendant] favored [S.R.]. [T.R.] felt that he was punished for anything and everything." Specifically, T.R. told Dr. Brooks that he was grounded, not allowed to watch television, and locked in his room without food and water. Dr. Brooks also testified that T.R. claimed that "he had gotten bruises and a black eye from [h]is stepfather." Dr. Brooks said that T.R.'s treatment adversely affected his health and welfare on both physical and psychological levels.

On cross-examination, Dr. Brooks stated that she became involved in this case after T.R. was referred to Le Bonheur by DCS. She noted that while she reviewed DCS records as part of her report, she did not interview the defendant, his wife, or any of T.R.'s teachers. She also testified that while she reviewed the victim's medical records as part of her evaluation, she said that she did not "know[] personally whether they were actually true or not." She admitted that in her report, she

noted that T.R. "gets angry when he's provoked," and that he had told her that he did not care what happened to his mother and stepfather. Later, Dr. Brooks said that T.R. had told her that he wished for his stepfather to remain in jail "for a long time" and for his mother "to get away from her husband" and "get on with her life."

Dr. Brooks testified that she believed T.R. was a credible witness. She noted that in her experience, in most cases where a child she interviewed retracted an allegation of abuse, the child "retracted [the statement] for reasons other than that it didn't occur. . . . Most of the case[s] where children retract criminal statements . . . [occur when] they want to go back with the family or somebody they love has gotten in trouble." However, Dr. Brooks noted that while she believed T.R. was a credible witness, it was possible that he could have fabricated these allegations.

Dr. Brooks testified that T.R. indicated that he had not been fed over a five-to-six-day period during his 2004-05Christmas break from school. She said that T.R. indicated that he was only given water during this period. Dr. Brooks said that T.R. said nothing to her "about going anywhere else and having any other meals" during that time. She said that T.R. had not reported any physical abuse between his mother and the defendant, and he also said that the defendant had never abused S.R. Dr. Brooks also said that T.R. did not indicate that the defendant had sexually abused him.

According to Dr. Brooks, T.R. indicated that the defendant "watched him in the bathroom to make sure he bathed correctly" because the defendant "did not feel [T.R.] was washing himself very well." T.R. also said that he occasionally got constipated and had encopresis. According to Dr. Brooks, T.R. reported that a doctor had told him that he was "the most clogged up child he had ever seen." On redirect examination, Dr. Brooks testified that she did not interview T.R.'s parents because she was not assigned to do so.

Officer Ferguson, testifying for the defendant, said that she did not interview the victim, his sister, the children's grandparents, or anyone at the Boys and Girls Club. She testified that she attempted to interview the defendant and his wife but was unable to do so after they invoked their right to counsel. She said that her investigation in this case consisted largely of reviewing the DCS investigation of the abuse and neglect allegations. She noted that while in most instances DCS made audio recordings of parental interviews when the parent is the focus of an abuse and neglect investigation, no audio recordings existed of DCS's interviews of the defendant and his wife. Officer Ferguson said she was unsure as to why no recordings existed in this case.

The defendant testified that he met his wife in May 2003 and married her in September 2004. He said that from the beginning of the relationship, he also tried to develop a relationship with S.R. and T.R. The defendant said that early on in the relationship, he discovered that T.R. "had this problem of [defecating] on himself." The defendant said that T.R. did this act several times, including once in a video store, at least once while playing video games, once while taking a bath at his grandmother's house, and once in his bedroom at the house his mother and the defendant shared. The defendant testified that he "believed that at least three fourths of the time it was voluntary." After the incident where T.R. defecated on himself in his bedroom, the defendant and his wife made T.R. go to the restroom at certain points during the day.

The defendant testified that he and his wife checked on T.R. while he was bathing to make sure he was bathing properly. The defendant denied standing in the bathroom the entire time while T.R. was bathing.

The defendant denied giving T.R. only bread and water. Regarding the children's eating habits, he said that until December 17, 2004, the defendant or his wife would take the children from the family home in Jackson to Chester County, where they would attend school and spend time with their grandparents before his wife picked up the children and returned to Jackson. The defendant said that the children would always have breakfast before school; the defendant said that sometimes the children were given cereal, a sandwich, or a toaster pastry at home, and other times the children would eat breakfast at McDonald's. The defendant said that the children would eat a small meal at their grandmother's house after school, and once the children returned to the defendant's house, the family would eat dinner together. The defendant denied that he forced T.R. to eat in his bedroom while the rest of the family ate together.

The defendant denied hitting T.R., stating that because T.R. was not his child, he did not spank T.R. or his sister. Rather, he said that his wife or the children's grandparents would spank the children. He also denied ordering the children not to speak to one another. Regarding his relationship with T.R., the defendant said that he got along well with T.R. until he married the child's mother, at which point his relationship with T.R. deteriorated. The defendant said that T.R. threatened to report the defendant to the juvenile court judge, and T.R. also told the defendant that Mrs. Gerhardt was cheating on the defendant.

The defendant said that at some point in January 2005, he noticed that T.R. had scratches and bruising on his face. When questioned, T.R. said that he had exited the house the evening of January 3 and climbed some trees behind the house. The defendant said that this news concerned him because the family's house was located in what he deemed "a very high crime area." In light of this episode, the defendant reversed the doorknob on T.R.'s bedroom door so that the door locked from the outside. The defendant said he locked the door when he went to bed, which was usually between midnight and 2:00 a.m., and he unlocked the door when he awoke at 6:00 a.m. The defendant said that after rearranging the lock, he made T.R. use the restroom before going to bed each night. If T.R. had to use the restroom after the door was locked, he would knock on the wall between his bedroom and S.R.'s bedroom, and S.R. would unlock the door. The defendant testified that around January 16, he bought a door alarm and placed it on T.R.'s bedroom door. The defendant said that he placed the alarm on T.R.'s door on Tuesday, January 18, and he did not lock T.R.'s door that night.

The defendant recalled that next day, January 19, DCS and the Jackson police began their investigation. Officer Scandrett with the Jackson Police Department and William McCrary, a DCS employee, inspected the house. According to the defendant, both men commented on how neat and orderly the house was. The defendant said that he and his wife then met with McCrary for five hours at the Madison County DCS office. The defendant testified that T.R. and S.R. were removed from his and his wife's custody on January 19.

The defendant testified that T.R. and S.R. spent the weekend of December 3-5 with their grandparents. Before the weekend, the defendant learned that T.R. had received two poor grades;

the defendant said that T.R. "messed up his grades on purpose." Given these poor grades and the "power struggle" between the defendant and his wife and his wife's parents over disciplining the children, the defendant instituted a list of restrictions which T.R. was to follow while staying at his grandparents' house. The defendant e-mailed these restrictions to his wife; this e-mail was introduced into evidence at trial. According to the e-mail, T.R. was to go to bed at 7:00 p.m. on Friday night and was not permitted to watch television or play video games. T.R. was permitted to watch one hour of television before lunch on Saturday and one hour after lunch; at all other times, T.R. was to "study all the time in the room" and refrain from "read[ing] any books other than direct schoolwork. . . . [H]e cannot come out of the room unless he has to use the bathroom or is eating (10 minutes to eat)." The e-mail also noted, "**EVEN IF HE IS TOLD BY ANYONE HE CAN BREAK ANY OF THE RULES (HE KNOWS THEM ALL) He knows not to and WILL be Punished ANYWAY.**" (caps and bold in original).

At some point before he was removed from the defendant's home, T.R., upon the request of his mother, wrote out a list of things which he had done wrong, a list which spans over fifteen pages. The defendant denied telling T.R. what to write, and he also denied rewarding T.R. with food if the boy "wrote things that were really bad." He also recalled that he occasionally took both children out to eat without their mother being present.

The defendant concluded his direct examination testimony by stating that he had never been interviewed by police. The defendant said that he "tried to contact Investigator Ferguson in March" but that the officer would not return his phone calls. The defendant also said that "the DCS investigation . . . was based on false statements." He also claimed to "have official documents from DCS saying that Mr. McCrary falsified documents filed in the DCS file."

On cross-examination, the defendant admitted that in September 2004, he wrote a letter to his wife's parents regarding the children's behavior. In the letter, which was admitted into evidence, the defendant wrote, "TO THIS POINT, I HAVE NOT SPANKED EITHER ONE OF THE KIDS. IF IT GETS TO THE POINT WHERE [T.R.] or [S.R.] WILL NOT FOLLOW OUR RULES OR OBEY US AND THESE PUNISHMENTS DO NOT WORK, THEN I WILL PUNISH THEM PHYSICALLY." (caps in original). The defendant also wrote, "[t]here are too many other things in life to have to worry about than to have to try and fix everything [T.R.] will mess up with his game playing and lies and making us be mad at each other. . . . **He has gotten away with a lot, but ONE WAY OR ANOTHER that is over**." (bold and caps in original). In the letter, the defendant accused T.R. of doing such things as hitting his sister so that she would scream, causing his mother to whip her, putting bandages on his fingers in an attempt to make his grandparents feel sorry for him, and lying to his teachers about being sick so that he would not have to take a test. In the letter, the defendant summarized T.R.'s status by stating, "HE WILL FOLLOW OUR RULES OR IT WILL GET WORSE FOR HIM." (caps in original).

The defendant testified that he had T.R. do one "write-off," which he had T.R. redo because the child failed to finish the task when he was first assigned it. The defendant also admitted that S.R. wrote a note to her mother which stated, "Jim is the nicest strongest best looking man my mother has ever dated. I, [S.R.], am a tale hole." The defendant said that he "didn't tell her what to write. She wrote based on our conversation while we were studying." The defendant said that S.R. "wrote

-8-

this on her own," but he also admitted that he did tell S.R. to "write it and go give it to [her] mom to aggravate her."

The defendant denied several allegations raised by the state on cross-examination. He denied keeping the children from their grandparents, denied hitting either child, denied feeding T.R. only bread, bologna, and water, denied making T.R. either sit on the bed or stand in one place in his bedroom, denied locking T.R. in his bedroom and leaving him alone in the house while the rest of the family went out, and denied ordering the children to refrain from talking to one another. He initially stated that T.R. was locked in his room on weekends as well, but he later stated that T.R.'s door was left unlocked the weekends of January 7-9 and January 14-16. Regarding the door alarms, which the defendant placed on T.R.'s door the evening of Tuesday, January 18, the defendant noted, "If I had thought of that, I would have done that at the beginning." The defendant admitted that the lock on T.R.'s bedroom door was still reversed (i.e., facing the hallway) when DCS and the Jackson police inspected the house on January 19.

Regarding T.R.'s behavior, the defendant testified, "He had bad behaviors, [but] I don't know that any child is bad they just act bad." The defendant did not take T.R. to counseling before the children were removed from his custody because of a bad experience involving his wife's uncle, who the defendant claimed deteriorated once he was put on psychotropic medication. The defendant said that he refused to participate in family counseling after the children were removed because "I invoked my Fifth Amendment [r]ight . . . . [T]here was not a signed [court] order and I chose not to cooperate."

On redirect, the defendant testified that he wrote the September 2004 letter to his wife's parents because he had verbally communicated his concerns about disciplining the children, but he perceived that his wife's parents were unable to comprehend his concerns. The defendant said that he was particularly concerned about an episode where T.R. allegedly grabbed S.R.'s breast, an act which the children's grandparents did not see as problematic. The defendant also said that he was concerned over the grandparents telling T.R. that he did not have to follow the defendant's rules while at their house. The defendant also accused the grandparents of giving T.R. the idea of reporting the defendant and his wife to the juvenile court judge.

Testifying as a rebuttal witness for the state, S.R., who was eleven years old at the time of trial, testified that after she and her brother moved into the defendant's home, T.R. would have to go straight to his room after coming home from school. S.R. said that T.R. did so every day and was not "free to come and go as he pleased." S.R. said that T.R. was fed only bread, bologna, and water during this time. S.R. also noted that T.R. was not allowed to go to the restroom at will; rather, "Jim would go knock on [T.R.'s] door and ask him if he needed to use the bathroom. If he did Jim would let him out so he could use the bathroom." S.R. also testified that whenever T.R. took a bath, the defendant "watched him."

S.R. testified that T.R. was left locked in his room "a little longer than" the midnight or 2:00 a.m. to 6:00 a.m. period identified by the defendant. She also said that her brother was left at home alone locked in his room, although she could not say exactly when this instance occurred. She also said that at times she could hear the defendant hitting T.R. "with boards or something," but she

admitted that she never saw the defendant hit T.R.

On cross-examination, S.R. said that she and her brother presently lived with her maternal grandparents. She said that she had talked with several people about this case, including DCS, a therapist, the district attorney's office, her grandparents, and her brother. She also admitted reviewing her testimony with the District Attorney's office and her grandparents prior to trial.

S.R. admitted that during the period when her mother or the defendant would transport her and her brother to school in Chester County, she and T.R. either ate breakfast at home or stopped at McDonald's for breakfast. She also said that she talked to her brother on the way to school, and she said that both she and her brother ate lunch daily at school. S.R. said that she was free to talk to her grandparents while she was at their house, but T.R. was confined to his room to do his schoolwork. S.R. said that her mother brought her and T.R. back to Jackson from Chester County each night; S.R. said that during the ride back to Jackson, both she and her brother could speak to their mother, but she did not recall if they could speak to each other. S.R. said that during the Christmas holidays, she and her brother both spent time at a babysitter's house; S.R. said that during this time, both she and her brother were fed regularly and were free to talk to each other, and that T.R. was not confined to a particular location while at the babysitter's residence.

At the conclusion of the evidence, the jury acquitted the defendant of the indicted offense of child abuse and neglect but convicted him of the lesser included offense of attempted child abuse and neglect. At the subsequent sentencing hearing, the trial court sentenced the defendant to six months in jail, with the defendant to serve sixty days in jail and the balance of his sentence on community corrections. The trial court also imposed a curfew of 8:00 p.m. to 7:30 a.m. and ordered the defendant to receive counseling. This appeal followed.

ANALYSIS

I. Sufficiency of Evidence

The defendant's first stated issue on appeal is that the evidence produced at trial was insufficient to sustain his conviction for attempted child abuse and neglect. An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given

to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The defendant was indicted on one count of child abuse and neglect. According to the statute under which the defendant was indicted, child abuse and neglect was committed by "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare . . . ." Tenn Code Ann. § 39-15-401(a) (1998) (amended 2005). "The offense of child abuse and neglect proscribed by [the former statute] is a single offense that may be committed through one of two courses of conduct: child abuse through injury and child abuse through neglect." State v. Mateyko, 53 S.W.3d 666, 668 n.1 (Tenn. 2001) (citing State v. Hodges, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998)).

The defendant was acquitted of the offense as charged in the indictment and convicted of the lesser included offense of attempted child abuse and neglect. Tennessee's attempt statute states:

(a) a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101 (a)-(b) (2003).

On appeal, the defendant argues that the evidence used to support his conviction is "irrelevant" given that the jury's verdict was not unanimous based on the trial court's failure to require the state to elect offenses and unreliable based on the trial court's refusal to answer a

question submitted by the jury during its deliberations. Those assertions are addressed later in this opinion.

In this case, the defendant was indicted on one count which alleged that the defendant committed offenses under both the abuse and neglect theories of the child abuse and neglect statute. Furthermore, at trial the state argued the defendant's guilt under both theories. Therefore, we must determine whether the evidence produced at trial was sufficient to support the defendant's conviction under both the theory of attempted child abuse and the theory of attempted child neglect. We conclude that the evidence is sufficient to support a conviction under both theories.

### *Attempted Abuse through Neglect*

In State v. Mateyko, 533 S.W.3d 666 (Tenn. 2001), the Tennessee Supreme Court examined the elements of the offense of attempted child abuse through neglect. The court held that first, "the State must prove that the defendant intentionally engaged in conduct constituting child neglect or that his conscious objective or desire was to neglect his [victim]. Mateyko, 53 S.W.3d at 676 (citation omitted). The state must also prove "that the defendant took a substantial step toward the commission of that offense." Id. at 673. Because "the offense of child abuse through neglect is principally a nature-of-conduct offense . . . the State has no burden . . . to show that the defendant intended that his [victim] suffer adverse effects to [his] health and welfare." Id. at 676-77. In this case, T.R., S.R., and the defendant testified that the defendant locked T.R. in his room at night. During the time he was locked in his bedroom, T.R. was not free to use the restroom as he pleased, despite the defendant's awareness that T.R. had been diagnosed with encopresis and was known to defecate on himself. The children also testified that the defendant limited T.R.'s diet, feeding him only bread, bologna, and water. T.R. testified that he was subjected to rigorous discipline, including numerous "write-offs" and threats of physical abuse, and T.R. testified that the defendant ordered him not to tell anyone about his treatment at the defendant's home. Based on this evidence, we conclude that the defendant "intentionally engaged in conduct constituting child neglect or that his conscious objective or desire was to neglect" T.R., and that he took a substantial step toward achieving this objective.

### *Attempted Abuse through Abuse*

The evidence was also sufficient to convict the defendant of attempted child abuse under the theory of physical abuse. At trial, T.R. testified that the defendant "committed acts of physical abuse on an almost daily basis including striking, kneeing, hitting and kicking [him] in various parts of his body, head and face." This evidence was sufficient for a rational factfinder to find beyond a reasonable doubt that the defendant's conscious objective was to inflict physical injury upon T.R. and that the defendant took a substantial step toward achieving that goal. As the evidence produced at trial was sufficient to support the defendant's conviction under both theories, we deny him relief on this issue.

### II.  Election of Offenses and Jury Unanimity

-12-

As part of his argument that the evidence produced at trial was insufficient to support his conviction, the defendant asserts that the trial court erred by failing to require the state to elect offenses at the conclusion of the trial. The defendant argues that this supposed failure on the trial court's part rendered the verdict non-unanimous and unreliable.

Initially, we note that the defendant did not raise many of the issues he raises on appeal in his motion for new trial. The election issue is one such issue. As such, the issue is waived on appeal and the defendant is limited to plain error review. "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. Crim. P. 52(b); see also Tenn. R. App. P. 36(b). In determining whether plain error review is appropriate, the following factors must be established:

> (a) the record . . . clearly establish[es] what occurred in the trial court;
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). On appeal, the defendant has the burden of establishing that these five factors are met. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) ("Gomez II") (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

In this case, we cannot conclude that the record accurately reflects what occurred at the trial level. The statement of evidence and the summary of trial proceedings presented by the state do not indicate whether defense counsel moved that the state elect offenses. The defendant insists that the trial court did not require such an election, but without a sufficient record, the defendant's assertion cannot be verified. Accordingly, we are constrained to conclude that the defendant is not entitled to plain error relief on this issue.

### III. Trial Court's Refusal to Answer Jury Question

During jury deliberations, the jury sent the following note to the trial judge: "Please define a criminal intent attempt of child abuse and neglect. Does it matter if he (defendant) knew what he did would cause harm?" The world "intent" was struck through, so that the initial sentence read, "Please define a criminal attempt of child abuse and neglect." In its written reply, the trial court stated, "You have been instructed on the law. Please refer to the jury instructions." The defendant argues that the trial court's "erroneous response to the jury's points of confusion" rendered the jury's verdict "unreliable." In making this argument, the defendant asserts that "[a]t least some jurors were confused over the legal definition of . . . criminal intent of child abuse and neglect," while some jurors were "confused over the legal definition of . . . criminal attempt of child abuse and neglect," and still other jurors "expressed uncertainty as to the culpable mental state of 'knowingly' required to be found by the jury beyond a reasonable doubt to sustain a lawful conviction under the child

abuse and neglect [s]tatute . . . ."

As was the case with the election issue, the defendant did not raise this issue in his motion for new trial. He also did not raise a contemporaneous objection to the trial court's refusal to answer the jury's question. As such, the issue is waived on appeal and the defendant is limited to plain error review. See Tenn. R. App. P. 3(e), 36(a); Tenn. R. Crim. P. 52(b). Our review of the plain error factors leads us to conclude that plain error relief is not warranted in this case.

Regarding the first factor, although the defendant has included the jury note and the trial court's response in the record, the record does not clearly establish the extent of the jury's supposed confusion. Although the defendant asserts that some jurors may have been confused over the definition of the culpable mental state of "knowingly," the jury's note did not contain the word "knowingly" or the phrase "culpable mental state." Additionally, the word "intent" was struck through on the jury's note, perhaps indicating that the jury did not, contrary to the defendant's assertion, have any questions regarding the definition of "intent."

The defendant also has not established that a clear and unequivocal rule of law has been breached. The defendant has not cited to any authority which states that a trial court is obligated to answer the jury's questions during deliberations or give a supplemental instruction in light of the jury's question. We are aware that a criminal defendant is entitled to a correct and complete charge of the law, State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000), and that the trial court may give a supplemental instruction when questioned by the jury, State v. Moore, 751 S.W.2d 464, 467 (Tenn. Crim. App. 1988). This court has previously reversed a defendant's conviction for failure to issue a supplemental instruction in light of an erroneous jury instruction. See, e.g., State v. Robinson, 239 S.W.3d 211, 226-28 (Tenn. Crim. App. 2006) (trial court's failure to answer jury question and issue supplemental instruction regarding inability of accomplices to corroborate each other where initial jury instruction did not inform jury of this "well-settled law" constituted reversible error). However, in this case the defendant did not request a supplemental instruction, and on appeal the defendant does not argue that the jury instructions were erroneous. Furthermore, our review of the instructions leads us to conclude that the instructions fairly and accurately stated the laws at issue in this case. As such, the trial court's referring the jury to its charge without giving an additional instruction did not prejudice the defendant. The defendant is therefore denied relief on this issue.

## IV. Questioning of Defense Witnesses During Cross-Examination

The defendant next argues that the trial court erred by allowing the prosecutor, during his cross-examination of the defendant and his wife, to ask whether S.R, who had not testified at that point, would be lying if she were to testify in such a way that would contradict the testimony offered by the defendant and his wife. The state argues that the defendant has waived this issue on appeal.

Regarding the cross-examination of Mrs. Gerhardt, we initially note that, as stated above, her testimony does not appear in the record. "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993) (citing State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim.

App. 1998)); see also Tenn. R. App. P. 24(b) (appellant has duty to prepare a record "as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"). Accordingly, we conclude that this issue is waived on appeal.

Regarding the defendant's assertion that his cross-examination was improper, we note that in his motion for new trial the defendant only challenged the cross-examination of his wife. As stated above, issues not raised in the motion for new trial are typically waived on appeal. See Tenn. R. App. P. 3(e); State v. Alvarado, 961 S.W.2d 136,153 (Tenn. Crim. App. 1996). Furthermore, the record reflects that defense counsel did not object to any of the numerous instances in which the prosecutor asked the defendant whether S.R. would be lying were she to offer testimony that contradicted the defendant's. Failure to raise a contemporaneous objection typically results in a waiver of the issue on appeal. Tenn. R. App. P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Thus, the defendant is limited to plain error review of this issue.

The record clearly indicates what occurred in the trial court as relevant to this issue. Regarding the question of whether a clear and unequivocal rule of law has been breached, we note that our courts have long held that "the propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court." State v. Schiefelbein, 230 S.W.3d 88, 133 (Tenn. Crim. App. 2007) (citing State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994); State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994)). "Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses." Id. (citing State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984)).

In arguing that the trial court's allowing the state to repeatedly ask the defendant whether S.R. would be lying if she were to offer testimony that contradicted his own, the defendant notes that other jurisdictions have held that "was witness lying" questions are improper on cross-examination. See generally United States v. Akitoye, 923 F.2d 221, 224 (1st Cir. 1991); State v. Savory, 893 S.W.2d 408, 411 (Mo. Ct. App. 1995); State v. Isom, 761 P.2d 524, 526 (Or. 1988). However, when faced with a similar issue, this court has found no error where the state's cross-examination of a defendant included asking the defendant whether a potential witness would be lying were the witness to testify in a certain fashion. In State v. Carlos Green, No. W2002-01963-CCA-R3-CD, 2003 WL 22718437, at * 7 (Tenn. Crim. App. Nov. 4, 2003), the defendant, who was charged with first degree murder after the victim was found shot to death, was asked on cross-examination whether he had a gun with him when he left an apartment the morning of the shooting. The defendant replied that he did not have a gun when he left the apartment. Id. The state then asked the defendant if a particular person, who was not called to testify during the state's case in chief, would be lying were he to testify that the defendant had a gun on his hip when he left the apartment. Id. The defendant replied, "Yes, he will." Id. The state then called this person as a rebuttal witness. Id. This court concluded that "[t]he State was not improper in attempting to attack the credibility of the defendant." Id. Similarly, in this case the state's asking the defendant whether S.R. would be lying were she to contradict the defendant was designed to attack the defendant's credibility. Accordingly, we cannot conclude that the defendant has shown that a clear and unequivocal rule of law has been breached.

Even if the prosecutor's cross-examination of the defendant did violate a clear and unequivocal rule of law, the other plain error elements cannot be met here. In his brief, the defendant does not address whether trial counsel's failure to object to the questions could have been a tactical decision, so he has not proven this element. The prosecutor's questions also do not appear to have adversely affected any of the defendant's substantial rights. The defendant cross-examined S.R. once she was called as a rebuttal witness for the state, so the jury had ample opportunity to assess her credibility. Furthermore, in its jury charge the trial court instructed that the jury was to be the sole judge of the credibility of witnesses, and on appeal we are to presume that the jury followed the trial court's instructions absent evidence to the contrary. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). The jury acquitted the defendant of child abuse and neglect as charged in the indictment, so we can presume that the jury followed the trial court's instructions and was not improperly affected by the questions asked of the defendant on cross-examination. As such, we conclude that the defendant is not entitled to relief on this issue.

## V. Prosecuting Attorney's Statements During Closing Argument

In the defendant's brief, while arguing that the prosecutor improperly cross-examined him and his wife, the defendant asserts that the state "improperly vouched for and bolstered the credibility of several . . . [s]tate's [w]itnesses during the [s]tate's closing argument to the jury." However, in his brief the defendant only cites to one specific part of the state's closing argument, in which the prosecutor referred to S.R.'s testimony. As such, we will limit our review of this issue to that part of the state's closing argument.

The defendant did not raise a contemporaneous objection to the state's closing argument. This court has repeatedly held that when a prosecutor's statement during closing argument was not the subject of a contemporaneous objection, any issues regarding the statement are waived on appeal. See Tenn. R. App. P. 36(a); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). The issue is also waived by the defendant's failure to raise it in his motion for new trial. See Tenn. R. App. P. 3(e). Accordingly, we are limited to plain error review of this issue.

The record reflects that during the state's closing statement, the prosecutor said, "I think the best witness, [S.R.], she did not want to get up there. She was a reluctant witness but she was a credible witness and everything that she said was consistent with what [T.R.] said and was not consistent with what the Gerhardts said." Thus, the first element of the plain error test is met.

In determining whether the prosecutor's statements violated a clear and unequivocal rule of law, we first note that our supreme court has recognized that closing argument is a valuable privilege for both the state and the defense and that counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn.1998); State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984). However, a party's closing argument "must be temperate, predicated on evidence introduced during trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 568 (Tenn. 1999). This court,

citing to standards promulgated by the American Bar Association,[9] has identified "five general areas of prosecutorial misconduct": (1) intentionally misstating the evidence or misleading the jury as to inferences it may draw; (2) expressing the prosecutor's personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) using arguments calculated to inflame the passions or prejudices of the jury; (4) using arguments that would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused or by predicting the consequences of the jury's verdict; and (5) intentionally referring to or arguing facts outside the record unless the facts are matters of public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

As relevant to this case, this court has held that the prohibition against the prosecutor's expressing an opinion regarding the truth or falsity of any testimony or evidence also "prevents the advocate from personally endorsing or vouching for [a particular witness or testimony] . . . the witnesses must stand on their own." Id. at 7 (citation omitted). Therefore, the prosecutor's statements that S.R. was "the best witness" and "a credible witness" were improper. However, we cannot reach the same conclusion about the prosecutor's statement that S.R.'s testimony was consistent with T.R.'s testimony and inconsistent with the testimony offered by the defendant and his wife. In that part of his closing argument, the prosecutor did not comment on the truthfulness of the testimony offered by any of the four witnesses, and he did not accuse the defendant and his wife of not being credible witnesses. Rather, the prosecutor compared the testimony of S.R., T.R., the defendant, and his wife, and made rational inferences based upon the testimony.

However, not all errors in closing argument necessitate a new trial. When a prosecutor's argument goes beyond the latitude afforded, the test for determining if reversal is required is whether the improper statement was so inflammatory that it "affected the verdict to the prejudice of the defendant." Harrington v. State, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965); see also State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007). Factors relevant to that determination include: (1) the disputed conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Gann, 251 S.W.3d at 460 (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)). In this case, it does not appear that the prosecutor's statement labeling S.R. as a credible witness was intended to inflame the passions of the jury. The statement was a fleeting and isolated one, one to which the defendant did not feel compelled to object at trial. Furthermore, as was the case with the issue regarding the prosecutor's cross-examination of defense witnesses, the defendant has not established that he failed to object to the closing argument for tactical reasons. Finally, as stated above the trial court instructed that the jury was to be the sole judge of the credibility of witnesses, and on appeal we are to presume that the jury followed the trial court's instructions absent evidence to the contrary. Williams, 977 S.W.2d at 106. Accordingly, we conclude that this issue does not necessitate plain error relief.

---

[9]See American Bar Association, ABA Standards for Criminal Justice: Prosecution Function and Defense Function §§ 3-5.8, 3-5.9 (3d ed. 1993).

## VI. Sentencing Hearing Transcript

On appeal, the defendant asserts that the trial court imposed an excessive sentence. In arguing this issue in his brief, the defendant also asserts that the trial court improperly denied him the transcript of the sentencing hearing, which prejudiced him by limiting his ability to "be provided meaningful appellate review over a vital right."

In Tennessee, "[t]here is no question . . . that an indigent defendant in a criminal prosecution must be provided with the tools of an adequate defense or appeal when those tools are available for a price to other defendants." State v. Elliot, 524 S.W.2d 473, 475-76 (Tenn. 1975) (citations omitted). "Generally, included in the basic tools has been a free transcript of prior proceedings in the indigent defendant's own case, where the transcript was needed to vindicate a legal right." Id. at 476 (citations omitted); see also Tenn. Code Ann. §§ 40-14-309, -312 (2006) (providing that indigent defendants are to be provided with trial transcripts at state expense). In cases similar to this one, where the defendant was not indigent at the outset of trial but finds himself indigent on appeal, the defendant may "file a motion with the clerk of the trial court seeking the entry of an order declaring him indigent, appointing counsel to represent him, and providing for the transcription of the evidence and proceedings relevant to the issues which will be presented to the appellate court for review." State v. Draper, 800 S.W.2d 489, 495 (Tenn. Crim. App. 1990); see also Tenn. R. Crim. P. 37(c).

In this case, the defendant followed the above-referenced procedure; after filing the appropriate motions, the trial court declared the defendant indigent and ordered that, "to the extent an official Court reporter was present to record the Court proceedings regarding [this case], [a] transcript shall be prepared for those proceedings at State expense, pursuant to Tennessee Code Annotated § 40-14-312." No transcript of the sentencing hearing was prepared, but contrary to the defendant's argument, the missing transcript did not result from the trial court's denying the defendant his constitutional rights. Rather, although not specifically stated by the trial court or the state, it apparently results from the fact that no court reporter was present at the sentencing hearing to record or transcribe the proceedings. In at least two of his filings regarding the transcripts in this case, the defendant stated that he was informed by the court reporter that at some point in May 2006, before trial, defense counsel had requested that the court reporter stop recording the proceedings in the defendant's case. In these filings, the defendant also stated that the court reporter did not resume recording the proceedings until December 2006, after the sentencing hearing was held. In at least one other filing with the trial court, the defendant argued that the court reporter actually was present during his trial and sentencing hearing, but he has presented no evidence to substantiate this assertion. Accordingly, we conclude that the trial court did not intentionally withhold the sentencing hearing transcript from the defendant, and we deny him relief on this issue.

## VII. Sentencing

Having resolved the issue of the sentencing hearing transcript, we next turn our attention to the defendant's assertion that the trial court imposed an excessive sentence. The defendant argues that the trial court improperly ordered him to serve jail time and that the counseling and curfew

requirements imposed as part of his community corrections probation were unreasonable. The state argues that the defendant has waived this issue on appeal by failing to include the transcript of the sentencing hearing.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2003). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Absent a transcript or statement of the evidence from the sentencing hearing, we are unable to review this issue. The requirement that the defendant prepare a record that conveys a fair, accurate, and complete account of what occurred with respect to the issues which form the basis of his appeal applies to sentencing hearings. See State v. Meeks, 779 S.W.2d 394, 397 (Tenn. Crim. App. 1988); State v. Beech, 744 S.W.2d 585, 588 (Tenn. Crim. App. 1987); Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, we deny the defendant relief on this issue.

## VIII. Ineffective Assistance of Counsel

The defendant next contends that he received the ineffective assistance of counsel at trial. In his initial brief, the defendant bases his assertion on several arguments, including: (1) an "irreconcilable conflict" between the defendant and trial counsel which resulted in an "adversarial relationship"; (2) counsel's failure to investigate certain issues; (3) counsel's cross-examination of a state's expert witness which elicited impermissible testimony that bolstered the credibility of a state witness; (4) counsel's failure to object to a state's expert witness's "general diagnosis of physical abuse and neglect of [the victim]"; (5) counsel's failure to object to the prosecuting attorney's questions and closing argument as detailed above; and (6) counsel's failure to call certain witnesses and failure to prepare those defense witnesses who did testify. In other filings, the defendant asserts numerous other grounds for his ineffective assistance of counsel claim.

The state argues that the defendant has waived this issue for failure to include it in his motion for new trial. See Tenn. R. App. P. 3(e) (in jury trial, errors such as those regarding "misconduct of jurors, parties, or counsel" must be raised in motion for new trial to be preserved on appeal). However, as trial counsel still represented the defendant at the time the new trial motion was argued, filing the motion at that time would have been impractical. The defendant did raise the issue in a pro se "Motion to Vacate and Set Aside Void Judgment," which the defendant filed pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure. However, at a hearing the trial court denied the motion without considering any of the issues contained therein, noting, "Rule 60.02 does not apply to this criminal case in the court's opinion. If somebody disagrees with me, they can so state at the

higher court, but that would not be a proper motion for me to take up in this criminal case."

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockart v. Fretwell, 506 U.S. 364, 368-372, 113 S. Ct. 838, 842-44 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

Although a defendant may raise an ineffective assistance of counsel claim on direct appeal, this court has repeatedly noted that "the practice of raising ineffective assistance of counsel claims on direct appeal is 'fraught with peril' since it 'is virtually impossible to demonstrate prejudice as required' without an evidentiary hearing." State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (citations omitted). In this case, because the defendant's ineffective assistance of counsel claim was not raised in his motion for new trial, there has been no opportunity for the trial court to make findings of fact as to the defendant's stated issue. As such, "it is inappropriate for us to consider the issue. Nevertheless, our abstention from considering the issue does not deprive the defendant of an opportunity to have this issue reviewed in an appropriate post-conviction proceeding if he so desires." State v. Slater Belcher, No. 03C01-9608-CC-00299, 1997 WL 749392, at *6 (Tenn. Crim. App. Nov. 26, 1997); see also State v. Robert Kern Holloway, No. M2002-01904-CCA-R3-CD, 2003 WL 22142497, at *8 (Tenn. Crim. App. Sept. 17, 2003) (reaching similar conclusion); State v. Michael J. McCann, No. M2000-2990-CCA-R3-CD, 2001 WL 1246383, at *13 (Tenn. Crim. App. Oct. 17, 2001) (same).

IX. Cumulative Error

The defendant argues that the "cumulative effect of the totality of trial errors when reviewed together, prejudiced [the defendant] by depriving [h]im of his [s]ubstantial and [c]onstitutionally

guaranteed [r]ights . . . ." However, "[b]ecause this court has found no error of substance on the part of the trial court, cumulative error would not serve as a basis for relief." State v. Steve Gass, No. M2000-02008-CCA-R3-CD, 2002 WL 29477, at *16 (Tenn. Crim. App. Jan. 9, 2002). The defendant is therefore denied relief on this issue.

## X. Errors Asserted in Reply Brief

In his reply brief, the defendant argues three additional issues that he did not raise in his initial brief. First, he asserts that the trial court did not have subject matter jurisdiction in this case. Second, he was prejudiced by several state witnesses who committed perjury during their testimony. Finally, he argues that his prosecution and trial in this case violated the Double Jeopardy Clause of the United States Constitution.

The Tennessee Rules of Appellate Procedure permit the appellant to file a reply brief "in reply to the brief of the appellee." Tenn. R. App. P. 27(c). However, this court has held,

> A reply brief is limited in scope to a rebuttal of the argument advanced in the appellee's brief. An appellant cannot abandon an argument advanced in his brief and advance a new argument to support an issue in the reply brief. Such a practice would be fundamentally unfair as the appellee may not respond to a reply brief.

Carruthers v. State, 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991). Accordingly, we will not address the issues raised by the defendant for the first time in his reply brief.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE